THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN J. STIGLIN, Appellant.

First Department, June 2, 1933.

*Curt H. G. Heinfelden* of counsel [*Alfred E. Smith, Jr.*, with him on the brief; *Curtin & Glynn*, attorneys], for the appellant.

*Felix C. Benvenga, Assistant District Attorney*, of counsel [*Philip A. Donahue, Deputy Assistant District Attorney*, with him on the brief; *Thomas C. T. Crain, District Attorney*], for the respondent.

O'MALLEY, J.   The defendant, a member of the municipal police force, New York city, has been convicted of perjury.   The offense is predicated upon alleged false testimony given in the prosecution of two women for vagrancy under the provisions of section 887, subdivision 4, clause (a) of the Code of Criminal Procedure.   The jury's verdict included a " strong recommendation for mercy."

The women were charged with having offered to commit an act of prostitution and were tried and convicted in the Ninth, District Magistrate's Court on March 11, 1929.   Their names were Winifred Sakwich, convicted under the name of Winifred Grason (hereinafter called Sakwich), and Jennie Domzalski Pappas, convicted under the name of Margie Wharton, also known as Jennie Domzalski (hereinafter referred to as Domzalski).

The testimony of the defendant on their trial was to the effect that they committed the act charged on March 7, 1929; that he and Officer Lamb had an apartment at No. 224 East Seventy-fourth street under observation at about one-fifty A. M. at which time he saw the women in company with a man named " Nick " Charles (hereinafter referred to as Charles) enter the apartment; that in about ten minutes he and Lamb entered, the door having been opened by one Emanuel Candillas (hereinafter referred to as Candillas); that he saw the Sakwich girl seated on a bed with her hat and coat off, and Charles, who had his coat and vest off, was seated with her; that, when he entered, the Domzalski girl jumped off another bed on which she was sitting, at which time she had her hat, coat and shoes off.

The four persons thus found were questioned by the defendant. Without at this time detailing the conversation, suffice it to say that his testimony was sufficient to warrant a conviction of each of the women upon the charge against her.   So far as this record discloses, the defendants, testifying in their own behalf, denied none of the material statements made by the defendant except his claim that they had been paid money by Charles and Candillas. Both were sentenced to prison.

In support of the indictment the prosecution showed that no offer of prostitution was made.   Chile Acuna, who testified in this and prior prosecutions growing out of the investigation of the Magistrates' Courts of the City of New York (*People* v. *Tait*, 234 App. Div. 433; affd., 259 N. Y. 599; *People* v. *Glenn*, 236 App. Div. 825; affd., 262 N. Y. ——), and who claims to have been employed by members of the vice squad of the municipal police force, as a " stool pigeon," in securing evidence against gambling and houses of prostitution, and who claims to have been used as the " unknown man " in this arrest, testified in substance that on

the evening of March sixth he met the defendant and Officer Drake, and another stool pigeon named Harry the Greek (hereinafter referred to as Harry) at Forty-second street and Third avenue; that the latter informed the officers that he " had a case uptown on the east side; " that he telephoned to some person and reported that the girls would not be ready until about eleven o'clock. Accordingly it was arranged that Harry and Acuna should meet the officers at about that time at Seventy-fourth street and Third avenue.

Pursuant to this arrangement they kept the appointment and met the defendant, together with Officers Drake, Lamb and Treubert, and a fourth officer, whose identity was unknown to Acuna; that Harry informed the officers that a friend named Nick (Charles) had agreed to allow him and Acuna to use his apartment at 224 East Seventy-fourth street, for the purpose of entertaining two prostitutes, who were hanging around a " speakeasy " in the neighborhood; that while they were standing discussing the matter, Acuna saw two girls come out of Perry's ice cream store on the west side of Third avenue in company with two men; that the defendant told him to " Go ahead and find out where they go," whereupon Acuna hurried to the premises 224 East Seventy-fourth street.

Acuna's testimony was to the effect that he waited on the stoop of the house until he saw Nick and the two girls approaching, and that he then preceded them up the stairs and kept them under observation until they entered apartment No. 17, upon the door of which he placed a chalk mark. He then returned to the street and informed the officers, who gave them ten dollars for their use; that he and Harry returned to the room and knocked on the door which was opened by Nick Charles who was in his shirt sleeves; that while they were thus engaged in conversation with him, the defendant and his fellow officers came and pushed them all into the room. His testimony was to the effect that at the time the officers entered the two girls were fully dressed and were standing in the kitchen of the apartment with two men and that no offer to commit an act of prostitution had been made. He was told by the police officers to return to the station house where he and Harry later met the defendant. He testified: " We told him, Harry the Greek and myself, why didn't they give us more time? Why did they come up so soon? In our opinion, if they had given us more time, we would have made a better case. They said it didn't matter, the girls were wrong. Q. Was anything mentioned about the money? A. Yes. Q. What? A. That we should keep

the $10. Q. What did you do with the money? A. Harry kept five dollars and I kept five dollars."

In addition, the People called the two women. Their testimony was to the effect that they were cousins and that both lived with the parents and brother of the Sakwich woman at 229 East Seventy-fourth street, almost directly across the street; that on the afternoon of March sixth the latter was sent by her father to pay a gas bill; that thereafter they went to Brooklyn where they attended a moving picture theatre and returned to Perry's candy and ice cream store at about eleven-thirty; that prior thereto the Sakwich girl had left a watch at Perry's store and that she had been instructed by her father to secure it; that when she asked Perry for the watch he said that he had left it with a friend for repairs, and thereupon telephoned to Nick Charles who came to the store; that Charles said that his room mate, Candillas, who was a jeweler, had it and that if the girls would go to his room they would be able to get it; that the girls then proceeded with Charles to his apartment and that on entering, Candillas, who was in bed, came out dressed in a bath robe, and that while the four of them were talking in the kitchen the officers entered and placed them under arrest.

Both girls testified to having seen a man on the front stoop as they entered (presumably Acuna) who, as already noted, testified that he had preceded the girls and Charles to the premises. One of the women testified that the man on the stoop preceded them up the stairs. Both, of course, denied any act which would tend to show that they made an offer of prostitution. They testified that they and Charles were fully dressed and that Candillas was in his bath robe; that they were slapped by the officers and that, notwithstanding that they informed them that they lived across the street, the officers refused to believe them or to investigate. Sakwich claims to have fallen because of being pushed down the stairs and to have sustained an injury to her nose.

Before the magistrate neither woman said anything about having gone to pay a gas bill. They testified that they had left home at about six o'clock in the evening and had returned to Perry's store at about twelve-thirty; that they there met Nick Charles, whom they had known for sometime and that he suggested going to a dance or cabaret, and also suggested that they go and get his room mate to make up a party; that they proceeded then to the apartment and that shortly after they had entered for the purpose of having Candillas accompany them to the dance, the officers entered and made the arrest.

Both girls admitted that they falsely testified before the magis-

trate with respect to the " dance " story, but stated that they were induced so to do by an attorney who represented them and who advised them that the " dance " story was preferable to the " watch" story.

In addition, there were other serious discrepancies too numerous to mention between their testimony on this trial and as given before the magistrate, before the referee who conducted the Magistrates' Court investigation and before the police commissioner on the trial of the defendant and other officers on charges.

Neither Charles nor Candillas nor Harry the Greek was called by the People in support of the perjury charge, nor were the parents or brother of the Sakwich girl called, although her parents were witnesses for the defense in the Magistrate's Court.

The evidence shows that at the time of their conviction both girls were suffering with venereal disease. The Domzalski girl, who came from Philadelphia, had been sent to the House of Good Shepherd in that city for waywardness, and after being paroled, was resentenced for a violation of such parol on numerous occasions. The record also indicated that she was addicted to drugs.

The witness Acuna, as appears from the record in *People* v. *Tait* (*supra*), was an unsavory character. He had been twice convicted. It is urged he had the strongest motive to falsify because of the fact that he had received substantial sums of money for his services in furnishing information. He had received some $2,400 from two newspapers and in addition had been receiving a per diem allowance of seven dollars from those in charge of the Magistrates' Courts investigation, and a similar allowance for a considerable period of time from the district attorney's office in assisting in the preparation and trial of cases.

It is the claim of the defense that he had access to the daily memorandum book of the defendant which contained a record of the arrest of the Sakwich and Domzalski girls prior to his having testified publicly in the Magistrates' Courts investigation. In addition it was shown that he claimed to have been the informer or stool pigeon in two prostitution arrests which took place at exactly the same hour on June 18, 1929, one at 71 West Seventy-first street and the other on East One Hundred and Seventeenth street. Upon his cross-examination on this trial he was unable to explain this discrepancy except by saying that it must have been the stenographer's error when he was furnishing the information.

While there were also discrepancies and inconsistencies in the testimony of the defendant upon this trial and that given before the magistrate and on other hearings, he testified substantially as he did in this Magistrate's Court and was supported by Officers Lamb and

Drake, who, concededly, were associated with him in the arrest. The testimony of these three witnesses was to the effect that they had been on duty from about eight-thirty or nine o'clock and had made three arrests prior to the time that they arrested the two women in question. The records in the station house show that these three arrests were made at twelve-forty-five A. M. and were booked at one A. M., the defendant participating in them.

In addition, there were three other arrests booked in the station house at one-fifty-five A. M., entries with respect to which were made prior to the entry of the arrest of the Sakwich and Domzalski women. The officers testified that this arrest was made at one-fifty-five A. M., and the station house entry showed the arrest was booked at two-ten A. M.

These records are referred to by the defense as indicating the falsity of the testimony of Acuna. According to the latter witness, he joined the defendant and his fellow officers, including Officer Treubert, in the neighborhood of eleven o'clock or eleven-thirty, and it is apparent from his testimony that the arrest followed within a brief period of time. Acuna claims he was unable to give the exact time. However, if he was with the police officers from eleven o'clock until the time of the arrest, as he claims, it would seem that he should have known something about the other arrests that had been booked in the station house prior to the arrest of the women. He makes no reference whatever in his testimony to these .

It will be recalled that according to Acuna, Officer Treubert was one of the arresting officers. The record in the Clinton and Delancey Street station house for the night in question shows that Treubert was assigned to reserve duty in uniform there from eight P. M. until four the following day. It shows that Treubert signed the reserve book in his own hand and he testified that after signing he remained at the station house all night. It is urged on behalf of the People that it was possible for Treubert to have left this station house after he had signed the reserve book. However, the evidence introduced on the part of the defendant was to the effect that he could not have done so without having been observed by the lieutenant at the desk.

The testimony of the defendant and of Drake and Lamb was further to the effect that after they had made the first arrests already mentioned and at about one-thirty, they observed two women at the corner of Seventy-fourth street and Third avenue in the act of soliciting a man; that they then observed them enter Perry's ice cream and candy store and later leave with Charles; that the three were seen to enter premises No. 224 East Seventy-fourth street. The defendant testified that he followed them up the stairs and

was in a position at the time they entered apartment No. 17 to see them go in; that he then returned to the street and joined Officers Drake and Lamb and that after waiting a few minutes the three went to the apartment and gained admittance, the door being opened by a man clothed in short underwear and a bath robe.

After entering, the conditions found were described substantially as was testified to by the defendant in the Magistrate's Court. Their testimony was sufficient to show that both girls had offered to commit an act of prostitution. They had each received money from Charles and Candillas. Both men stated in the presence of the women that they had come to the apartment for the purpose of having "a good time" and the money which they had paid the girls was taken from the latter by the officers and returned to the men. All three officers denied that Acuna or Harry was present or used in the arrest. They also denied mistreating the women.

Perry Lantz, the proprietor of the ice cream and candy store in question, called on behalf of the defendant, testified that he had no recollection about the Sakwich girl leaving a watch with him or that she or either of the girls had come into his store on the night in question to inquire about a watch.

In addition the attorney who represented the Sakwich and Domzalski girls in the Magistrate's Court, a member of the bar in good standing so far as this record discloses, denied that he had suggested that the girls adopt the "dance" story rather than the "watch" story. He testified that the story the girls told in the Magistrate's Court was the one which they first told him when they recited to him the happenings of the night in question.

A probation officer, Mrs. McCauley, who interviewed the Domzalski girl on the morning of March tenth, testified that she had told her that Charles had invited her to go to a cabaret on the night in question; that they went to his room to get his friend and that when they reached Charles' room his friend was found in bed and that shortly after he got up the arrest followed.

It is manifest that upon this evidence as thus outlined there was presented a sharp issue of fact between the defendant and his witnesses on the one hand and Acuna and the two women on the other. According to the prosecution there was a deliberate "framing" by the defendant and his fellow officers of two wholly innocent women; according to the defense, the persons arrested were prostitutes and were guilty of a violation of the statute under which they were arrested and prosecuted.

It is urged by the defendant that if the women were innocent and had been shamefully framed in the presence of two men, one of whom, Candillas, was known to Domzalski, and with whom,

according to her testimony before the magistrate (denied on this trial), she had been out several times prior to the arrest; and who also on this trial testified that Charles had visited her uncle frequently, it was to say the least most unfortunate that neither man was called as a witness in support of the claim that the women at the time of their arrest were in the room for an entirely innocent purpose. The Sakwich girl testified on this trial that Charles, though not known to her, was a friend of her father.

It is further urged that the failure of the People to call the parents of the Sakwich woman, who testified for the defense on the magistrate's hearing, and whom it is claimed might have testified that the women at the time were leading respectable lives, if such were the fact, is indicative of the falsity of the claim of the prosecution upon this issue. It is also pointed out that the Sakwich woman, who admits that she did not secure the return of the watch from Candillas on the evening of her arrest, seems never to have made an effort to secure possession of it thereafter.

It is urged by appellant's counsel that in view of the polluted source of the People's testimony and the many inconsistencies, discrepancies and admitted falsehoods found in the testimony of the two women and in the testimony of Acuna, the verdict is not supported by the weight of the evidence and the defendant was not shown to have been guilty beyond a reasonable doubt. We are asked, therefore, to reverse the judgment upon this ground alone.

But it is further urged that, even assuming the verdict has sufficient support, the conviction should be reversed because defendant was not accorded a fair trial. It is asserted that the attitude of the trial judge was hostile to the defendant and that his conduct during the trial indicated prejudice and bias and an apparent effort to strengthen the case of the prosecution and to weaken that of the defense.

In thus reviewing the material evidence we do not mean to hold that the defendant's version, rather than that of the prosecution, should have been accepted. Undoubtedly the credibility of the defendant and some of his witnesses was unfavorably affected by contradictions, misstatements and inconsistencies in their testimony. However, in our view their credibility was affected in no greater degree than that of the three main witnesses called by the People. The defendant, so far as the record discloses, was possessed of good character and of a creditable record as a police officer. We advert to the character of the evidence for the reason that the alleged errors are to be judged and appraised in the light of the defense raised and the sharpness in the conflict of the testimony. Even

though the defendant's guilt was shown and the verdict justified, it should not stand if the defendant was not accorded the fair trial to which he was entitled under the law.

Of the numerous alleged assignments of error, we will consider only those we deem to have been most prejudicial. Not only the defendant, but his fellow officers who participated in the arrest and others who were members of the vice squad, deny that they had ever used stool pigeons as " unknown men," in securing arrests in prostitution cases. Lieutenant John J. Martin, under whose authority the defendant was working, was questioned with respect to whether he did not have knowledge that " stool pigeons " were sometimes so used. He denied such knowledge. In his charge to the jury the court said: " In fact, there was one old officer who had been, I think, 23 years on the force and up to the present time he has not learned that the ' unknown man ' was sometimes an informer. I think the last words he said as he left the stand were, ' I don't know it yet.' After being 23 years on the force the only conclusion I can reach is that he has read nothing in the newspapers and is entirely unaware of the results that have occurred in these courts in the last 2 or 3 years."

This statement undoubtedly reflected unfavorably upon the credibility of this witness. Beyond this, however, it seems to us that its effect was to give to the newspaper accounts of the hearings before the referee and of the trials before the deputy police commissioner — all of which was hearsay — the stamp of judicial approval. The jury were in effect told that the accounts appearing in the newspapers with respect to the use of stool pigeons in these cases might be accepted as worthy of credence.

In support of the prosecution the district attorney emphasized the expense accounts of the various members of the vice squad as proof that money had been paid to Acuna and other informers for assisting in these arrests. In fact, the expense account of the defendant in connection with this case was the sum of eight dollars and twenty cents. This expenditure was explained by the fact that money was sometimes paid for securing information from persons not regularly employed and that it included other arrests made the same evening by the police. There was evidence tending to show that money was sometimes expended for taxicab hire, and that taxicab drivers were paid for information. In his charge the court stated: " As I say, all the officers deny knowing Acuna and one of them said he thought Acuna was a bondsman's runner; the others said they never talked to him at all or ever used him. They used taxicab drivers. I confess in this case I have formed a higher opinion of a taxi driver's job from a pecuniary point of view than

I ever had before because of the money, as shown in these expense accounts, that went to these taxi drivers; they would get a dollar for a ride and half a dollar for a tip, judging from the testimony developed during this trial."

In further commenting upon the testimony of the police officers called by the defendant, the court said in his charge: " So far as the defendant Stiglin is concerned, of course, his interest is apparent; it means his liberty.  So far as the other police officers are concerned, you may consider whether or not there is a feeling of *esprit-de-corps* in the Police Department that would lead one officer to support another and help him out if he can.  You may consider whatever interest they may have as it may affect their own futures."

It is urged by the appellant's counsel, and as we think, properly, that the comment first above referred to tended to cast discredit upon the testimony of the defendant and other police officers in their explanation of the expenditures made by members of the vice squad.  We are also of opinion that the court's comment last quoted was prejudicial.  It was a suggestion coming from the trial judge that the police officers who testified in behalf of the defendant were influenced by a spirit of loyalty to the defendant and to members of the force in general, and by their own interest, rather than by a desire to testify truthfully.

In charging upon the question of the possible motive with which the defendant or any police officer would have for making arrests in framed cases, or in considering an assignment to the vice squad desirable, the court stated: " The State is not obliged to prove a motive.  There are some facts in the case from which you might or might not infer a motive.  You might infer a motive from the testimony as to whether or not this detail in plain-clothes was a desirable detail, especially with the opportunity it gave for putting in expense accounts; whether that was a motive which should lead an officer to make cases in order to produce results and retain his position, but, as I say, the State is not obliged to prove motive.  If they prove the facts, the motive may rest hidden in the man's heart who committed the act."

It seems to us that the court in so charging pointedly suggested to the jury they might find that the defendant and other police officers engaged in similar work framed cases in order to retain a desirable assignment, because of the opportunity it afforded for putting in " padded " expense accounts.

As already appears, the defendant had given testimony to the effect that Charles and Candillas had each paid five dollars to the two women.  The money so paid was taken by the arresting officers and each bill was marked and was offered in evidence against the

women in the Magistrate's Court. The defendant testified that he returned other money to the two men and the evidence showed that this was the usual custom in making arrests in cases of this character.

On the examination of Officer Drake, the trial judge in commenting upon this custom stated in substance that, from his experience as a former magistrate, he found that similar testimony was always given in prostitution cases. In this connection the witness was questioned by the court as follows: " Q. You mean if the man had had a good time, you would let the girl keep the money? A. No, she is not entitled to the money. Q. This is very complicated; it is something that has puzzled me for ten years, when I was a Magistrate. I would like to get an explanation of it."

In charging the jury the court stated: " On that question of the $5, I might as well touch on it now. It is a thing that I have never been able to understand. It was testified to here that that is the usual practice, that the officer produces a five dollar bill with his initials on it or his shield number on it and says that is the $5 which was used. Of course, that has no probative value whatever. People get superstitions, they get legal superstitions. I don't know why, but they get them somehow and they think that by showing a five dollar bill and saying that is the five dollar bill, that bolsters up the case. Well, it does not bolster up the case because it depends on the word of the man who presents the five dollar bill. If the five dollar bill had been marked before and given to a man and then found in the possession of the woman, if you could prove that it had been marked before the occurrence and given to a man and then was returned by the woman, it would have some probative value because you would argue, ' Well, here is the same bill that passed from the man to the woman,' but when a man pulls a bill out of his pocket and says, ' My initials are on this bill and this is the bill that the woman gave back,' that does not prove it any more than his verbal testimony proves it. I mean it does not in any way corroborate his testimony because if he is lying about his testimony, he might just as well take any five dollar bill and mark his initials on it. So this system of marking five dollar bills I have never been able to understand."

The court's remark during the examination of Officer Drake and his subsequent statements to the jury upon the same subject were calculated in our opinion to cast discredit upon the testimony of the officers and of their method of securing evidence.

It will be recalled that the two women on their trial before the magistrate testified that they adopted the so-called " dance " story in preference to the so-called " watch " story on the advice of

their counsel. This was denied by the attorney who testified for the defendant upon his trial. In charging the jury the court said upon this subject: " The girls claim that they were taken down to Jefferson Market Court and then they met this Nick Charles, who got them the distinguished lawyer whom you saw on the witness stand, and that they went into a huddle with him and discussed what their best defense would be. Their testimony is that they, first of all, told the story about the watch and that the lawyer rejected that story and then they finally agreed on the story that they were going there to meet a fourth man and go to a dance as being a better story. I. don't know why the dance story was better than the watch story, but at all events that is their testimony. That, of course, is contradicted by Mr. Cohen. You heard him on the witness stand, you heard him testify that not only in this case, but in no case in his whole life had he ever advised any client to swerve from the truth in telling a story and, certainly a sentiment of that kind is praiseworthy and it is a credit to him, if true. You heard him testify a moment or two afterwards that he could not have advised them to say a certain thing, not because it was not true, but because it would not help."

Upon the same subject the court further charged: " So far as Mr. Cohen's testimony in particular is concerned, I may point out that if Mr. Cohen had corroborated the two girls, that they had made up these different stories and had then selected the best one, he of course would be subject to disbarment and a possible prosecution for subornation of perjury. Those things are, of course, obvious."

This comment upon the testimony of the attorney would seem to be a clear indication that in the court's opinion he was not worthy of belief, and that his failure to support the testimony of the two girls was because of the fear of a possible disbarment or a prosecution for subornation of perjury. As already noted, there was nothing in the evidence to reflect upon the character or standing of this attorney save that he was retained by Charles to represent the two women in their defense and that he did defend them on the charge in the Magistrate's Court.

It was claimed, of course, by the defense that the evidence not only justified, but required a finding, that the two women in question were prostitutes. As already noted, each was suffering with a venereal disease. The Sakwich girl had testified that she had been seduced under a promise of marriage and that she had intercourse with only one man. The Domzalski girl had testified that she was married and had a child and had been deserted by her husband. In charging upon this subject the court said: " The girl Winifred

Sakwich, except for the conviction on Stiglin's testimony, has an absolutely unblemished record, so far as the court is concerned. She says that she was seduced by someone. That goes very largely, undoubtedly, to her credulity. How far it affects her credibility I don't know. That is a question which you may consider in your jury room, and whether the gentleman who seduced her also gave her a dose of gonorrhea does not make her either more or less truthful. That is also something for you to consider. There has long been a theory that female chastity and veracity have some connection. Fortunately, that rule does not apply to the other sex, so far as I know; but you gentlemen may take into consideration the fact that both of these girls, at least one of them, Winifred, had been seduced and the other woman after she was married also had a dose of gonorrhea. Personally, I think there is no legal, nor necessary, connection between gonorrhea and truthfulness. There are a great many truthful people, I believe, who have had gonorrhea, and probably some untruthful people, but you may take that into consideration."

The credibility of these two witnesses was of the utmost importance. The prosecution rested upon their testimony and the testimony of Acuna. It seems to us that the charge of the court was calculated to give the impression to the jury that, so far as the court was concerned, the testimony of the two women respecting their character and the manner in which they contracted the disease was entitled to full credence.

In discussing the testimony of the Sakwich girl, in his charge, the court said: " At all events, they came in there and one of the officers, according to Winifred Sakwich, said, ' What are you doing here? ' and she said, ' What is the matter, is this a bad house? ' Now, that is a small incident, but it seems that you might consider it, give it what significance or what weight you think it is worth — that she was surprised at finding this place ' pulled,' as they say. If she expected to go around to a house of prostitution, would a girl who was as stupid as she appears to be say, ' Is this a bad house? ' the first thing when the officers came in, and of course she lived across the street, there is no dispute about that, and she must have known whether or not this was a bad house."

In our view, these remarks were prejudicial. They must have impressed the jury with the court's belief in the truthfulness of the testimony of the Sakwich girl. In so charging, it seems to us the court invaded the province of the jury and cast his view in favor of the witness' credibility. Why would she, the witness, necessarily have knowledge that a house of prostitution existed on

the third floor of a tenement across the street from where she lived?

Other alleged prejudicial remarks of the trial judge, both during the course of the trial and in his charge, are urged upon us. However, we deem it unnecessary to consider each in detail. Suffice it to say that we are of opinion that the cumulative effect of the matters already discussed and of those not mentioned, leads to the conclusion that the defendant was not accorded a fair trial, to which he was entitled.

While few exceptions were taken during the course of the trial, the following is referred to as indicating the attitude of the trial judge: " Mr. Heinfelden [Defendant's counsel]: And I want to state for the record that I wish your Honor would cease making these remarks, that he would cease smiling and frowning and doing things which might lead the jury to believe that he has an opinion as to the facts in this case, and I ask the Court to please instruct the jury to disregard any such smiles or frowns or what-not as the jury may see the Court make."

In reply, the court instructed the jury and stated that he would again instruct them at the close of the case, that they were the sole judges of the facts and were not to be influenced by any opinion he entertained, and that " I will endeavor to preserve that impassivity of countenance which is desirable."

It is well settled that we are vested with discretionary power to reverse even in the absence of an exception. (Code Crim. Proc. § 527.) It is true the power should not be exercised except where, upon an examination of the whole case, it " appears affirmatively " (*People* v. *Driscoll*, 107 N. Y. 414, 417) that " manifest injustice " (*People* v. *Burgess*, 153 N. Y. 561, 575) has been done to the defendant, and where it is apparent that a different conclusion might have been reached.

We are of opinion that this case is one where the exception to the rule should be applied. It is clear from a consideration of the evidence that there was a closely contested question of fact for the jury's determination. In reaching their conclusion they should have been permitted to do so wholly uninfluenced by any matters which would tend to cause prejudice or bias against the defendant and his witnesses. The defendant was entitled to have his evidence weighed in equal balance with that of the prosecution and to have received from the trial judge the same consideration as was accorded the prosecution. In *People* v. *Odell* (230 N. Y. 481, 487) it is said: " The court's charge is of supreme importance to the accused. It should be the safeguard of fairness and impartiality and the

guarantee of judicial indifference to individuals.'' We are clearly of the opinion that the conduct of the trial judge in this case did not measure up to the required standard.

While it is true that the jury were told that they were to reach their decision uninfluenced by any opinion which the court entertained, this statement in our opinion was ineffectual to eradicate from their minds the impression which they must necessarily have gained from the attitude of the court during the trial as indicated herein.

It follows that the judgment should be reversed and a new trial granted.

MERRELL and TOWNLEY, JJ., concur; FINCH, P. J., dissents and votes for affirmance.

SHERMAN, J. (concurring). A careful examination of the record here leads to the conclusion that the finding of the jury was against the credible evidence, and, in addition, I hold that the defendant was not accorded a fair trial.

The proof of perjury committed in the Magistrate's Court rests entirely upon the testimony of two prostitutes who, with light regard for their oath, have erred in their testimony in so many respects as to render their evidence utterly unworthy of belief, and of one Acuna, an infamous self-confessed criminal and stool pigeon, who did not claim to have ever done an honest day's work and who, in this case, was flatly contradicted by records and testimony which show that he cannot be relied upon as a truth teller. He had achieved prominence as a witness in the investigation of the Magistrates' Courts and had appeared as a witness against malefactors responsible for the evils which were then revealed. He has successfully accused some of those with whom he had acted in concert in unjustly convicting women in the Women's Court. Here, however, records in evidence show that his testimony cannot be true. He admits the receipt of fairly large sums from newspapers which paid him for articles which they printed and also of moneys for his upkeep from the investigating committee and the district attorney's office.

Upon the trial of a perjury charge, much depends upon the light in which the jury regards the defendant who takes the witness stand. A lapse of memory, a contradiction here and there of some more or less salient fact, affords an opportunity to stigmatize him as swearing falsely upon the trial, and if such an impression be conveyed to a jury, there is a strong possibility that they will convict him of the perjury charged in the indictment largely because of these variances in his testimony at the trial. In effect, therefore,

a defendant may actually be convicted of the perjury charged in the indictment because of erroneous answers made with respect to collateral matters upon the trial. Care must be taken by the trial court to avoid that possibility.

We must bear in mind that the perjury charged is said to have been committed before a magistrate more than three years before the trial. Proof of that crime must rest upon the strength of the prosecution's case and may not, as is attempted here, be justified solely because of what are claimed to be erroneous matters testified to by the defendant upon this trial. These are not the subject of the perjury charged.

In a case of this character, it is essential that the safeguards which the law has designed to protect the accused should be upheld and applied. I concur in the careful and painstaking opinion of Mr. Justice O'MALLEY, pointing out that the defense was discredited by the court. It is no answer to state that defendant's counsel did not from the outset object to the attitude and comments of the learned trial judge. Counsel should not be put in the position of being compelled to object to the court's attitude and thereby possibly affront both court and jury. Knowing that the extent of punishment in the event of conviction lies largely in the hands of the trial justice, counsel would be impelled to avoid any conflict. Nevertheless we find that defendant's counsel did at one time object to the creation of the atmosphere against his client. In my judgment neither objection nor exception is essential where the unfairness of the trial speaks from the record itself. This court has taken occasion in civil cases to reverse judgments founded on remarks where the trial justice had indicated a view or adopted a course which made it difficult, if possible, for a party to succeed. (*Trupin* v. *N. Y. City Interborough R. Co.*, 237 App. Div. 515.) In *Bolte* v. *Third Avenue R. R. Co.* (38 App. Div. 234) this court, speaking through RUMSEY, J., laid down in no uncertain language the requisites of a fair trial and the duty of the trial justice, and called attention to the fact that the case was rare indeed in which a court was called upon to indicate a belief. The duty of the court to insure to a defendant in a criminal case a fair trial by a jury is of transcendent importance. Justice is achieved only if that right is upheld. (*Powell* v. *Alabama*, 287 U. S. 45, 52.)

I concur in the reversal of the judgment of conviction, and the granting of a new trial.

MERRELL and TOWNLEY, JJ., concur.

FINCH, P. J. (dissenting). This is one of the cases which grew out of an investigation into the Magistrates' Courts. The defendant was

indicted for perjury and has been found guilty by a jury after a trial lasting six days. Certain of the testimony on behalf of the defendant was upon its face perjurious, as, for instance, denial of any knowledge of Acuna. This fact did not help the case of the defendant with the jury. In so far as the court may have indicated a personal opinion regarding certain of the testimony, the court was careful to instruct the jury that they should disregard any opinion of his which the jury might have inferred. In *People* v. *Leach* (146 N. Y. 392, 396) it was said: " That he [the court] should have commented upon the evidence, and, perhaps in some expressions, have indicated the bent of his own mind, is not a subject for adverse criticism so long as he did not invade the province of the jury and withdraw from them the consideration of any facts, or lead them to suppose that their determination was not wholly with them."

The charge of the court was clear, and fair to the defendant. No objection or exception was taken. In this connection, it is worthy of note that defendant's attorney, in answer to the inquiry of the court at the close of the charge, " Have you any exceptions or requests? " said: " Well, I can't say that I have any specific exceptions to the charge. I think your Honor has characterized testimony of witnesses, particularly with reference to Cohen, calling him a ' distinguished attorney,' with sarcasm, and things of that kind, but there is nothing that I can point specifically to." That counsel for the defendant could call to mind nothing to complain of specifically except the application of the word " distinguished " to an attorney, is a fact that speaks for itself. I do not believe the case at bar is one in which the interests of justice require this court to reverse the judgment appealed from upon the grounds urged, in the absence of objection and exception. The case presented a square issue of fact and I believe the jury found in accordance with the great weight of the evidence. None of the alleged errors complained of in the majority opinion were excepted to.

The judgment should be affirmed.

Judgment reversed and a new trial ordered.