THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* WILLIAM THOMAS, Appellant.

First Department, February 2, 1934.

Henry A. Lowenberg, for the appellant.

Joshua Egelson, Deputy Assistant District Attorney, of counsel [Thomas C. T. Crain, District Attorney], for the respondent.

TOWNLEY, J. The defendant was convicted of manslaughter in the second degree. The charge upon which he was tried was that between three and four o'clock on the morning of January 1, 1932, he had stabbed his wife with a bread knife in an apartment which they occupied in the city of New York. The wound which resulted in the death of the decedent was about an inch wide, about six inches deep and had completely severed the femoral artery, a large artery in the leg. There was no one present at the time the wound was inflicted excepting the deceased and her husband, the defendant. The claim made by the prosecution was that the decedent's wound was inflicted by the husband. The defense claimed that the wound was self-inflicted and that she had committed suicide.

The police were summoned to the defendant's apartment by a telephone call made by defendant. When they arrived they found the decedent on the floor in the kitchen with a stab wound in the right groin and with considerable blood on the floor near the body. There was an ordinary bread knife lying on the floor with the point toward the deceased and the handle towards the door leading into the public hall. There was no one in the apartment at the time the police arrived. Later investigation showed the existence of bloody footmarks leading upstairs from the apartment to the roof of the building. These footmarks were found to continue down the stairs of the adjoining building to the second floor when they became so faint as to be no longer traceable. The defendant returned to the apartment about five or ten minutes after the arrival of the police. He admitted that he had been there at the time the wound was inflicted but said he had nothing to do with it. He said that he had come home at about three o'clock and started to undress in the kitchen, that his wife had come in from the bedroom, had complained of the hour and asked where he had been. He told her that it was none of her business. Continuing, he testified, "While I was bending down taking my overalls off, she fell over like that. * * * I seen her fall, and I looked back and I seen all the blood. * * * I knelt down alongside of her and said, My God, what have you done, and kissed her. * * * Then I went to the telephone, called the ambulance and police."

When the defendant returned to the apartment, it was noticed that there was blood coming from his left arm and on examination it was discovered that he had two cuts on it. The police testified

that he told them he did not know where or how these cuts had been received and he testified to the same effect when he was examined as a witness. The medical examiner, however, testified as follows: " I asked him how he got those wounds. * * * He said that he had a quarrel with his wife and that she attempted to stab him and then stabbed herself." Defendant testified that he had no recollection of what happened after he saw his wife lying on the floor and left the apartment, until he came to in the street in the neighborhood of Dyckman street, which was about a block from the apartment where he lived.

The defendant, who was about thirty-six years old, had married the decedent in September preceding her death, and there was testimony in the record indicating that there had been frequent quarrels. According to the testimony of decedent's mother, after a quarrel on Christmas preceding the death, the defendant had said (apparently not in the hearing of his wife), " I am going to kill you yet." Defendant had an excellent war record. Although a German by birth, he had served in the American army during the war, had twice been decorated by the French with a Croix de Guerre, and had been regularly employed as a chauffeur driving a truck for a construction company for some time prior to the alleged crime. He had no criminal record and had never been in trouble prior to the charge which is involved in this proceeding. There was independent testimony that about six weeks before her death, after a quarrel with defendant, the deceased had threatened to commit suicide. The defendant took the stand and testified that he had nothing to do with the death of his wife and denied even seeing the knife before she fell.

There was, therefore, presented a case where the only evidence of the guilt of the defendant was circumstantial in character. As against the circumstances relied on by the prosecution, there were the good character of the defendant, his war record, his direct testimony, the fact that he put in a call for the police and an ambulance, the fact that the medical examiner conceded that the wound could have been self-inflicted, and the deceased's threat against herself.

It is claimed on this appeal that the circumstances presented were wholly insufficient to meet the requirements of the rule laid down by the cases as to circumstantial evidence. We believe that there was sufficient proof in this case to justify submission of the question of the defendant's guilt to the jury. The defendant, however, was entitled to a fair submission of the issue tendered free from interference or expression of opinion by the justice presiding at the trial. The record demonstrates that this was not accorded

him and that the conduct and the remarks of the court in connection therewith were highly prejudicial to the defendant's rights.

During the summing up, there was some controversy with respect to the statements made by defendant's counsel. In the course of this, the court said: " The Court: There is no evidence of suicide. There is not a single witness said she committed suicide. Mr. Garlock [defendant's counsel]: The defendant took the stand and said she sunk to the floor in a pool of blood. The Court: Yes, but he did not say that she stuck the knife into herself. Mr. Garlock: I say it is reasonable to assume. The Court: You are assuming something not in evidence. Mr. Cohen [District Attorney]: There is no evidence of that." By this statement the court in effect told the jury that there was no evidence to support the only defense which the defendant had to the crime charged.

There was testimony in the record that the decedent had died of a knife wound of the character above indicated. The testimony of the defendant was that there was no one present excepting himself and the woman at the time she fell on the floor in a pool of blood and that he had not touched her. If this testimony be true, the only possible inference is that the wound which concededly caused her death was self-inflicted. It was highly prejudicial for the court under those conditions to indicate in the presence of the jury that there was no testimony at all to support the defense. The court, in its main charge on that subject, said: " Every killing is a homicide, and this killing was either manslaughter in the first degree or in the second degree, or else it was suicide on the part of the deceased, *according to the allegations made by counsel, and the theory of the defense.*" (Italics ours.) At another point in its charge the court said: " It is *suggested* by the defendant's counsel and by the defendant that this woman must have killed herself. Now, there is no presumption that the woman killed herself." (Italics ours.) Further references in the court's charge to the subject of suicide are plainly of a character tending to indicate to the jury that there was nothing more substantial to support the defense of suicide than the *allegations* made by counsel and the *suggestions* made by the defendant.

The court in its charge, referring to the claim of the prosecution that it was improbable that a woman would stab herself in the place where this wound was found and that a woman would not have sufficient strength to inflict such a wound, said: " Now, in considering that testimony there are two things which you should dwell upon. The first is the amount of force necessary to drive a knife that far into a human being; and secondly, on the question of suicide, is it or is it not likely that a woman who meant to kill

herself would stab herself in that particular place? That is a question which seems to me of great importance.

" Of course, when I refer to something as a matter of great importance, you should not think that I mean to say that that is decisive, but you should look upon that matter and give it such weight in the jury room as you think it is entitled to. But I feel justified in pointing out to you that one of the factors in this case is the position and depth of the wound.

" In connection with that you may also take into consideration the testimony here which is uncontradicted, that this woman had sustained a fracture of her right wrist, and consequently that hand was weak. The defendant testified to that himself. She was able to use the hand, but the hand was weak, did not have the strength of the left hand, the hand which had not been fractured. And you may consider that when you come to take up the question of the depth of this wound."

The court in this statement entirely ignored the testimony of the medical examiner that the prior injury to decedent's hand had little effect upon its strength and that her wound could have been self-inflicted.

With respect to the wound on defendant's arm, the court said: " There is another point in Dr. Gonzales' testimony which I might as well tell you about now instead of coming back to it, and that has to do with the wounds upon the defendant.

" He testified that the defendant had two wounds upon him. I will read you from the minutes:

" ' I examined him and I found that he had one inch superficial wound, cut, on the outer surface of the left elbow, which measured from one-quarter to three-eighths of an inch in depth.'

" Now, a wound that is from one-quarter to three-eighths of an inch in depth is a noticeable wound at least. And Dr. Gonzales testified that that wound was on the defendant. You may take his testimony as to the size of the wound into consideration when you come to decide whether or not the defendant is telling the truth when he says he does not know how he sustained that wound. ' The other wound was an inch and a quarter in length but was a superficial scratch.'

" There was another point in Dr. Gonzales' testimony which you may consider when you come to compare it with the defendant's testimony which was as follows:

" Dr. Gonzales said: ' I asked him where he got those wounds? He said he had a quarrel with his wife and she attempted to stab him, and then stabbed herself.'

" Now, gentlemen, when you come to that point in the case you

will consider that as opposed to the defendant's testimony that he does not know how he got the wound, that he did not see his wife stab him, and his story to the officers that he did not know how he got those wounds.

" On that point, while I am touching on the wounds, I may point this out also: The defendant said that for a certain period of time his mind was a blank. He fixed that period of time as after the collapse of his wife on the floor, after he said he knelt down and kissed her and telephoned, and stepped over her body to go out; and he said from that time up till he heard the ambulance bell, his mind was a blank. Well, if that was the case, could he have sustained or did he sustain those wounds after he left his apartment and before he heard the ambulance bell when his mind was blank? If he did not sustain those wounds in that period of time, he must have sustained them when his mind was not a blank. And if you find it was not a blank when he sustained them, it is for you to say whether or not he is telling the truth when he says he does not know how he got them.

" That is something to be considered in passing on his testimony and in passing on the statement Dr. Gonzales said he made to him, that he had a quarrel with his wife and she attempted to stab him.

" On that point, of course, you may very well consider what interest, if any, Dr. Gonzales has in this case. As you have heard here on the witness stand, Dr. Gonzales is attached to the Medical Examiner's office. His functions are purely to pass on questions involving the death of a deceased, and he is not connected in any way with the Police Department or the District Attorney's office. He is an independent physician attached to the Medical Examiner's office.

" And of course you may also ask yourselves what interest the defendant has in lying or telling the truth? I need not go into that, because that interest is obvious. Every man who is on trial for a serious offense would naturally like to get out of it if he could. At least, I assume so; that would be in conformity with human nature."

At the conclusion of the charge, counsel for the defendant in connection with the subject covered by the above quoted excerpts requested the court to instruct the jury:

" 21. That even if they find that the defendant told the medical examiner that the deceased cut his arm before stabbing herself they may nevertheless find that the defendant testified truthfully at this trial and they may nevertheless acquit him."

This request was refused. The court by its refusal to charge as requested substantially instructed the jury that if they believed

the medical examiner, Dr. Gonzales, as to what the defendant told him about the cut on his arm, they could not acquit the defendant. The request, in view of what the court had said on this subject in its main charge, was entirely proper and the court's refusal to charge as requested was prejudicial to the defendant and tended to aggravate the harm done the defendant by the statements made in the course of the main charge in connection with this subject.

The court, referring to the absence of blood on defendant's trousers, said: "Patrolman Smith testified, when he was recalled on redirect examination, that there was no blood on the defendant's trousers. That is important simply as bearing on the truth of the story told by the defendant, that after his wife collapsed, he knelt down alongside of her and kissed her; and the defendant indicated on the photograph which is in evidence, that he knelt down alongside of her knee. You will see that that blood is very thick, because there is a large pool of blood showing in the photograph. Now, is it possible for a man to kneel down in a pool of that kind and not have blood marks on his trousers? That is a question which you will have to pass upon in the jury room. I am not trying to express any opinion on it. There was blood on his shoes because there were bloody footprints going upstairs and going across the room, but the testimony of the officer was, there was no blood on his trousers."

In connection with the footprints leading to the roof and into the adjoining apartment, the court in its charge said: "Now, a man may attempt to flee, may attempt to run away, may think it over and come back. You gentlemen will give just whatever weight you think it is entitled to.

"There is no dispute that there were bloody footprints going up to the roof, and that those footprints started down the next house. There were no bloody footprints going from the apartment downstairs. So if you believe that testimony, the inference would be that the defendant made his exit by going upstairs across the roof, and down through the adjoining house. It is for you to say whether or not that indicates an attempt at flight on his part; and if you think it does indicate an attempt at flight, does that flight indicate any consciousness of guilt? That is a question of fact for you to pass on."

It will be noticed from these excerpts that the court emphasized every circumstance in the case which was relied on by the prosecution as indicating guilt on the part of the defendant. The statements are not made in the form of a mere narrative of the claims made by the prosecution in connection with the testimony but are advanced as personal arguments of the court concerning the significance which should be attached to various parts of the testimony

contained in the record. They amount in effect to an animated argument in support of the People's claim. The general statement by the court at the conclusion of the charge to the effect that the jury were the judges of the facts, that they were not to assume that the court had any opinion, and that the jury were not to be influenced by any remarks of the court was wholly insufficient to cure the wrong done the defendant and the prejudice resulting from the improper attitude assumed during the course of the charge.

We had occasion to condemn similar conduct in *People* v. *Stiglin* (238 App. Div. 407). In that case, as in this, the court attempted to cure the legal consequences of its remarks in the charge by general statements as to the functions of the court and jury. This court held that this was entirely insufficient to undo the wrong which had been accomplished by the improper remarks. In the *Stiglin* case we also had occasion to criticise the conduct of the trial judge in building up the credit to be attached to the testimony of a witness relied on by the prosecution by the suggestion that such witness had no interest in the prosecution and no reason to testify falsely and then contrasting the position of such witness with that of a defendant charged with a crime and anxious to escape punishment.

Another instance wherein the rights of the defendant were prejudiced was in connection with the testimony offered by the defendant that his quarrels and difficulties with his wife had resulted from the disclosure by her that she was of colored blood and for that reason was unwilling to have children, and that the decedent because of that had been morose and depressed. The court not only excluded this testimony but refused to allow defendant to answer the direct question, " Did she ever say that she would kill herself?" In connection with the testimony of a prior witness, however, he had instructed counsel, " I will allow you to ask the witness if the deceased ever told him she was going to kill herself. You can ask that question." This excluded testimony was clearly competent as bearing on the probability of suicide. (*People* v. *Conklin,* 175 N. Y. 333, 343; 3 Wigm. Ev. § 1726.)

Many other instances might be pointed out wherein the court's rulings were entirely favorable to the prosecution and where the rights of the defendant have been ignored. During the examination of a Mrs. Wagner, called as a character witness, she had been asked whether she had any children. Without any objection on the part of the district attorney, the following colloquy took place: " The Court: What has that got to do with this case? We are not trying her. We are trying a case that hasn't anything to do with children. So leave them out. Mr. Garlock: I must say I did not notice any such asperity when witnesses for the prosecution were being ques-

tioned. The Court: You mind your own business. Try your case and don't make any further criticisms of the way I conduct this trial."

The conduct proper for a justice to observe in a criminal case is not difficult to understand and his duty has been prescribed by statute and decision. The charge of the court in this case comes squarely within that condemned by the Court of Appeals in *People* v. *Becker* (210 N. Y. 274, 306), where the court in its opinion said: " In his charge at the close of the trial the presiding judge defined with accuracy many of the principles of law which governed the jury in their consideration of the evidence and in the disposition of the questions of fact. He then outlined in much detail and most effectively the claims of the prosecution and the evidence which had been produced to support those claims, leaving it to the jury, with few and meagre exceptions, to evolve from their own unaided memories the recollection of any arguments or evidence in behalf of the defendant which tended to contradict and rebut such arguments and evidence of the prosecution."

In this connection we feel constrained again to call the attention of the court to the statement in the opinion of this court in *People* v. *Stiglin* (*supra*) that " The duty of the court to insure to a defendant in a criminal case a fair trial by a jury is of transcendent importance. Justice is achieved only if that right is upheld."

This defendant has not had a fair trial and for that reason the judgment of conviction should be reversed and a new trial ordered.

FINCH, P. J., MERRELL, MARTIN and GLENNON, JJ., concur.

Judgment reversed and a new trial ordered.